H-H Ranch, Inc. v. Commissioner.
H-H Ranch, Inc. v. Commissioner
Docket No. 879-63.
United States Tax Court
T.C. Memo 1965-119; 1965 Tax Ct. Memo LEXIS 213; 24 T.C.M. (CCH) 626; T.C.M. (RIA) 65119; April 30, 1965
*213 Richard Weinberger, 77 W. Washington St., Chicago, Ill., for the petitioner. Kenneth B. Samuels, for the respondent. WITHEY
Memorandum Findings of Fact and Opinion WITHEY, Judge: Deficiencies have been determined in the income tax of petitioner for the taxable years 1958 and 1959 in the respective amounts of $7,586.37 and $15,568.91. By an amendment to its petition, petitioner claims an overpayment of its income tax for each year. The primary issue to be determined is whether respondent has erred in treating petitioner's receipts from sales of lots in each year on an ordinary income basis. Another issue, raised by the petition, is whether regardless of whether such receipts represent ordinary income or capital gains, they represent taxable income only in a prior year to those at issue because of petitioner's claimed accrual method of accounting. Finding of Fact Some of the facts have been stipulated and are so found. Petitioner, hereinafter sometimes called H-H Ranch, an Illinois corporation, was incorporated on June 15, 1950, with an authorized capital of 200 shares of common stock, all of which are issued, outstanding, and held as follows: Number of
Name of
shares
stockholder
Relationship
80
William W. Heise, Sr.
Father
80
Marjorie B. Heise
Mother
20
William W. Heise, Jr.
Son
20
Theodore Heise
Son
*214 For 1958 and 1959, petitioner filed its income tax returns on a calendar year basis with the district director of internal revenue at Chicago, Illinois. The officers of petitioner during the years 1950 through 1959 were as follows: Name
Title
William W. Heise, Sr.
President
M. I. Brain
Secretary Marjorie Heise and M. I. Brain are one and the same person. The name M. I. Brain is the maiden name of Marjorie Heise. Petitioner acquired the Elgin Farm, which was contiguous to the City of Elgin, Illinois, from William W. Heise, Sr., and Marjorie Heise on June 30, 1950, in exchange for common stock of petitioner. Blackhawk Builders, hereinafter sometimes referred to as Blackhawk, is an Illinois corporation incorporated in 1941. During the year 1959, all of its authorized capital stock was held by William W. Heise, Sr., and Marjorie Heise. During the same year, William W. Heise, Sr., and Marjorie Heise were vice president and president, respectively, of Blackhawk. From 1950 through the years at issue, Blackhawk was William W. Heise, Sr.'s "building corporation." Since its incorporation, Blackhawk Builders has been in the business of building houses and selling *215 them to the public. William W. Heise, Sr., has been in the building business to some extent since 1914. William W. Heise, Sr., Marjorie Heise, William W. Heise, Jr., and Theodore Heise are the sole stockholders and officers of Heise Brothers Realty, Inc., and Illinois corporation, engaged in the sale of real estate. On April 2, 1953, the officers and directors of H-H Ranch and Blackhawk met and adopted the following resolution: It is agreed by an between H-H Ranch Inc. and Blackhawk Builders, Inc. that Blackhawk Builders, Inc. will and does agree to pay a fair cash price for said lots in Blackhawk Manor Subdivision in the First, Second, Third and Fourth Additions owned by the H-H Ranch Inc., based on and taking into consideration values set up by the Veterans Administration on said property or lots in the Subdivision of Blackhawk Manor. It is understood that Blackhawk Builders, Inc. are to install improvements in time to come, in keeping with loan commitments as set forth and as required by the Veterans Administration and also the City of Elgin. It is further understood between the Corporations or parties to this contract, by their respective Officers, that in case Blackhawk *216 Builders, Inc. does not, or for any reason is unable to install said land improvements covering sewer work, sanitary or storm sewer, street improvements, curb and public walks, then the said H-H Ranch Inc. has the right to install said improvements and charge Blackhawk Builders for the same, plus 4% interest on monies advanced. It is further understood between the Officers of the respective Corporations of this agreement, that a fair cash market value of the lots to be purchased in Blackhawk Manor is to be the value as set out by the Veterans Administration, less the cost of street and sewer and public walk improvements made necessary to have the lots meet, merit and justify the value set upon them by the Veterans Administration. So that there will be no misunderstanding between the Corporations and the signors of this agreement, it is requested that a copy of this agreement be signed and spread on the Corporate records of the H-H Ranch Inc. and Blackhawk Builders, Inc. It is further resolved that the Officers of the H-H Ranch Inc. and Blackhawk Builders, Inc. be authorized to sign this agreement and record same in the corporate records of the Corporations' minutes. This above *217 resolution was passed as of this date by the Board of Directors and signed by the Officers of the Corporation of Blackhawk Builders, Inc. and the resolution was placed in the records of the Corporation minutes. In January 1953, Blackhawk acquired from H-H Ranch about 22 acres of the Elgin Farm which Blackhawk subdivided into a total of 77 lots, which lots were designated as Blackhawk Manor Subdivision. In 1954, H-H Ranch conveyed more of the Elgin Farm acreage to Blackhawk since Blackhawk, having completed its buildings on the 77 lots designated as Blackhawk Manor Subdivision, needed more real estate. On July 18, 1956, petitioner conveyed to Blackhawk an additional portion of its real estate which Blackhawk designated as Second Addition to Blackhawk Manor. On September 27, 1957, petitioner entered into an agreement with Blackhawk to sell real estate, the legal description of which corresponds to the Third Addition to Blackhawk Manor. The property was conveyed in accordance with the agreement. Under the terms of the agreement, Blackhawk was to pay petitioner $2,000 per lot when a lot without a building was sold to a third party, or when a permit was taken out for a building *218 to be constructed on a lot to be sold to a third party. The Veterans Administration Certificate of Reasonable Value, referred to in petitioner's April 2, 1953, agreement with Blackhawk, reflected lot value figures, inclusive of offsite improvements, ranging from $2,100 to $2,500 per lot. The agreement further provided that any lots remaining unsold or unpaid for by Blackhawk at the end of 5 years should be reconveyed to petitioner free and clear of all encumbrances. Petitioner did not report on its Federal income tax return for the taxable year 1957 any profit from the sale of real estate constituting the Third Addition to Blackhawk Manor. Petitioner did receive and report on its Federal income tax return $12,565.70 from a sale of real estate to the Illinois Toll Road Commission. Pursuant to the agreement dated September 27, 1957, between petitioner and Blackhawk, there was recorded on page 17 of petitioner's general journal for the year 1958 a credit to its Land account of $45,050 to record the sale of real property representing 17 lots (Lots 446 through 462) to Blackhawk on October 15, 1958. These 17 lots are shown on the plat of the Third Addition to Blackhawk Manor. *219 There was recorded on page 19 of petitioner's general journal in December 1958 an entry debiting sale of land in the amount of $960 and crediting "Land, Elgin" in a similar amount concerning the sale of 4.8 acres of land representing Lots 315 through 324 and Lots 421 through 426. The foregoing 16 lots are shown on the plat of the Third Addition to Blackhawk Manor. There was recorded on page 24 of petititioner's general journal for the month of December 1959 an entry crediting "Sale of Land, Elgin" in the amount of $102,400 with the following explanation: To record sale of lots numbering 78 at $400. 4A, 5A, 6A, 7A, 8A, 9A, 10A, 11A, 12A, 13A, 14A, 15A, 16A, 17A, 18A, 19A, 20A, 21A, 38A, 39A, 40A, 41A, 42A, 43A, 45A, 46A, 47A, 48A, 49A, 50A, 51A, 52A, 53A, 54A, 55A, 56A, 57A, 58A, 59A, 60A, 61A, 247, 248, 249, 313, 314, 213, 214, 215, and 216 at $2,000. [1]
The foregoing 52 lots *220 are shown (without the suffix "A") on the plat of the Fourth Addition to Blackhawk Manor, a resubdivision of a part of the Third Addition to Blackhawk Manor. The $77,050 and $102,400 shown on petitioner's tax returns for the years 1958 and 1959, respectively, represent moneys received by petitioner from Blackhawk in connection with the sale of lots representing a part of the property described by the agreement dated September 27, 1957, between petitioner and Blackhawk. Petitioner incurred zoning costs of $1,600 in connection with the sale of lots in 1959. Petitioner suffered losses from its farming during each of the years 1951 through 1959 with the exception of the year 1955 when it showed a profit of only $85.89. The net farming loss for this period (including the year 1955) aggregates $48,528.14. Petitioner realized substantial gains from the sale of real estate during each of the years 1953, 1954, 1956, 1957, 1958, and 1959. The total net gains, after reduction for expenses of sale, zoning costs, real estate taxes, and other expenses, aggregate $292,006.54. In no year during the period 1951 through 1959 did petitioner suffer a loss from the sale of its real estate. The *221 only real estate in petitioner's Elgin Farm property now owned by petitioner is a small area designated as "Proposed Shopping Center." The accountant who maintained the accounting records of petitioner during the years 1957, 1958, and 1959 was Vernon Crosell. The same Vernon Crosell prepared petitioner's income tax returns for the years 1957, 1958, and 1959. The books of petitioner reflect the date money is received from Blackhawk as a result of the sale of lots by Blackhawk to third parties. The gains from the sale of land comprising a part of the Third and Fourth Additions to Blackhawk Manor were not reported on petitioner's income tax return for the year 1957, nor does the record disclose that any entry was made in petitioner's books for the year 1957 reflecting gains from the sale of such land. Gains from the sale of land comprising a part of the Third and Fourth Additions to Blackhawk Manor were recorded on petitioner's books and reported on its income tax returns for the years 1958 and 1959. Petitioner's balance sheets for the years 1957 and 1958, as shown on its income tax returns for these years, disclose no notes and accounts receivable and no accounts payable. *222 During the years 1957, 1958, and 1959, there were no entries to petitioner's account entitled Accrued Real Estate Taxes. Petitioner received a loan from Blackhawk during the year 1957. During the year 1959, it paid Blackhawk $2,273.31 representing interest on this loan. On its income tax return for the year 1957, petitioner did not deduct any accrued interest expense. On its income tax return for the year 1959, petitioner deducted $6,513.23 as interest expense. On its income tax returns for 1957 and 1958, petitioner indicated that inventories, consisting solely of steers, were not an income-determining factor in determining its gross profit. Ultimate Findings During the years at issue, in addition to the business of farming, petitioner was engaged in the business of subdividing real property into improved lots and selling such lots to customers. The lots under discussion were held by petitioner primarily for sale to customers in the ordinary course of petitioner's trade or business. The income from the sale of these lots was properly reportable by petitioner for the years 1958 and 1959. Opinion Petitioner's position here is premised upon the separateness for tax *223 purposes of the corporate entities represented by H-H Ranch and Blackhawk. It contends that all transactions involving real property conveyed by it to Blackhawk were conducted by that entity alone and that any resulting tax is solely attributable to Blackhawk. Respondent's position is premised upon the existence of an agency between petitioner as principal and Blackhawk as agent. We think the record amply establishes such a relationship. It is true that petitioner was incorporated for the purpose of carrying on farming and that throughout its existence it has carried on a farming business in several locations, including originally a location designated as the Elgin Farm, but it is equally true that soon after coming into existence it evidenced its intention to engage also, at least indirectly, in the business of subdividing raw land, improving the same, and selling improved lots as a dealer therein. The demonstration of this intention is the April 2, 1953, agreement between it and Blackhawk, set forth in our findings, and the agreement of September 27, 1957, between the same parties subsequent thereto. The subsequent agreement was we think merely amendatory of or supplemental to *224 the first and continued to establish and maintain the existence of the agency of Blackhawk in the sale of the involved lots. The substance of these agreements, while in form evidencing sales of parcels of Elgin Farm, in actuality do not evidence sales of such parcels. The parcels were transferred to Blackhawk for the specific purpose of subdividing, improving, and the convenience of sales of resulting lots. No purchase price was required to be paid by Blackhawk in all events and, in fact, Blackhawk was permitted to return to petitioner any property in the form of subdivided lots which it had failed to sell within a prescribed period. The amount of the sales price (to others) of the lots was fixed by reference to "values set up by the Veterans Administration." The values thus determined by that agency ranged from $2,100 to $2,500 and the amount thereof to be received by petitioner only upon and in the event of the sale of each lot was fixed at $2,000. Blackhawk was therefore to receive for its services in subdividing, improving, and selling an amount per lot ranging from $100 to $500. We think these amounts represented sales commissions to Blackhawk and payment for services rendered. *225 We note that petitioner itself paid at least some of the expenses incident to the platting and zoning of the subdivision, a fact which is inconsistent with the ownership of the land by Blackhawk and consistent with its character as the agent of petitioner. We note also that petitioner has shown a regular and consistent loss from its farming operations during the years at issue while its only net gains have been derived from its receipts from the sale of lots effectuated by Blackhawk. In short, we are convinced, and so hold, that petitioner, as principal, during 1958 and 1959, was engaged in the business, through Blackhawk as its agent, of subdividing, improving, and selling parcels of Elgin Farm as lots to its customers and that its gains therefrom must be treated as ordinary income. Cf. , affd. ; . As for petitioner's contention that any income it realized from the sales of such lots was in reality realized by it upon the execution of the September 27, 1957, agreement with Blackhawk because of its claimed accrual method of accounting, we think the evidence requires *226 a contrary holding. It is true that petitioner's books and records contain some indication of the form of accrual accounting in the way of an account heading such as "Accrued Real Estate Taxes," but no entries were made in such account for any of the years at issue and the treatment of income and expenses are otherwise those of a cash basis taxpayer. The only evidence we have to the contrary is the testimony of petitioner's bookkeeper who stated such accounts were prepared and maintained on the accrual basis. Such evidence will not stand in the face of the book entries themselves. We note too, that in its returns for 1957 and 1958 petitioner indicated that inventories were not income-determining factors. In any event, because of our holding that Blackhawk acted throughout the sale of the Elgin Farm properties as subdivided lots merely as petitioner's agent, we do not view the September 27, 1957, agreement as anything more than an employment contract as distinguished from an agreement of sale or exchange. We note also that the agreement can in no way be construed to provide by its mere execution any more than an executory promise to forward to petitioner $2,000 per lot only in case *227 each lot is sold. This does not satisfy the necessity in proper accrual reporting that all of the factors establishing liability of the payor exist at the date such payments are accrued by the taxpayer. ; ; , affirming . Because of the last above holding, petitioner's contention that it made an overpayment of tax for 1958 and 1959 is rejected and respondent's denial thereof upheld. Because respondent's computation of petitioner's proper tax in view of our holding does not appear to be in dispute. Decision will be entered for the respondent. Footnotes
1. This fact is stipulated on the record but there is no accounting therein for the fact that the number of lots stipulated to have been recorded on the books of petitioner at $2,000 per lot lacks $2,000 of equaling the total amount of receipts therefrom which is stipulated to have been $102,400.↩